Case 13-5311 USA v. Carlos Johnson. Oral argument, 15 minutes per side. Mr. Perry for the appellant. You may proceed. Good morning, Your Honors. May it please the court. My name is Edwin Perry. I represent Carlos Johnson, the appellant in this matter. This case is an issue of first impression before the Sixth Circuit, but it has been ruled on in a number of circuits already. That's been pointed out in the briefs. Essentially, the error that we submit the district court engaged in in this analysis at the sentencing hearing was disregarding application note 17 to 2D 1.1 B12. And that application note requires the district court to engage in an analysis of frequency, which is a matter of time, not just the extent of the crime. But what if it's a storage case? A storage case would also still involve frequency. How can you get any more frequent than having the room filled with marijuana all the time? Well, if an individual rents a storage locker or a storage space for only that purpose, in other words, gets that storage place and 100% of the time it's used for that one purpose, well then it's very frequent. So how, what percentage of the time were the relevant room not used for marijuana storage? Well, obviously an individual... Isn't that just this case? No, Your Honor. Wasn't it close to 100%? No, Your Honor. In fact, it's more like 5.6%. And I'll explain how I get to that number in a sec. But basically, over a course of eight months, not six months as was stated in the brief incorrectly, from March 30th, 2011 to December 1st, 2011, over those 246 days, we can surmise from the record, and the record admittedly is not well-developed. It's essentially an uncontested sentencing hearing about the facts, just contested about the law and how it's applied. So the PSR is really our basis for all of this. And based on the PSR, we have a delivery three times to 400 Pittman in Blytheville, Arkansas. And the duration of the time period in which the marijuana is there, again, surmised from the PSR, is somewhere between one to two days on the March 30th delivery, around seven days in the May 23rd to May 30th delivery, and then about two days for the November 30th delivery, which results in the seizure on December 1st. You're doing that from the drop-off and then the pick-up? That's your guess? Right, which was the operation. The point of having the residents in Blytheville in the conspiracy was not to distribute from that house to individual buyers in Blytheville or surrounding area. The point was to unload it from a tractor-trailer from Texas, briefly, and then distribute it to Memphis and parts of the Mid-South by other individuals, not out of the home, but other lower-level people on the chain of the conspiracy. So, essentially... Was it a bedroom? In the first house, it was a bedroom? Yes, Your Honor. Well, when it was seized, a lot of the marijuana and cash and certainly the firearm were all found in the bedroom, yes, Your Honor. We can't say, though... So what is the evidence? The marijuana's there for a couple of days and then the younger child moves back into his bedroom, then new delivery, yeah, you're going to have to go down to the basement. Here comes the thing of marijuana. I mean, what does the evidence show in terms of how that room was used? The evidence, unfortunately, would only show what was used on December 1st because that's when law enforcement executed the warrant or got consent from Mr. Johnson's wife at the 400 Pittman address and seized the...or 225 Lakewood, excuse me, on December 1st and seized the marijuana. And at that point, it was in the master bedroom, yes. We can't assume that's how it was always done, but that's how it was done on December 1st. So, essentially, we get roughly...and there's a fourth shipment that is not contested that happened sometime in that eight-month period, but there's no discussion exactly of when that is in the PSR or the extent in terms of duration that the marijuana was present at the 400 Pittman address because, again, that was an uncontested subject that there was a fourth shipment. And all these shipments were roughly the same amount of marijuana, around 300 pounds. So, all told, I think, Your Honor, we can surmise that there was about 14 days in which marijuana was present at either 400 Pittman or later at 225 Lakewood. And 14 days out of 246 days, which was the time period from March 30th, 2011 to December 1st, is about 5.6% of the time. So, factually, Mr. Johnson submits that he is distinguishable, certainly from the conduct present in Sanchez and Miller, the two cases most prominently cited by the United States at the sentencing hearing. So, I assume you agree frequency is kind of a totality test, right? I mean, it's not the only thing you consider. Certainly. It's one of the indicia, yes. So, should we...well, let's just say you're right. 14 days out of 246 days, but does the amount or volume... I mean, I think you would agree that was a significant volume of marijuana. So, does that...I mean, that obviously cuts the other way. How does it work? I mean... Certainly, Your Honor. It's one of the indicia. Certainly has to be the extent of the amount of drugs as well, not just the duration in which drugs are present in the home. Is this 1,200 pounds in this case? Roughly, Your Honor. Yes. A lot of marijuana. So, over 500 kilograms of marijuana. And that's why we have a level 28 base offense level, yes. Is that the largest marijuana case I've ever had, Your Honor? No, but there are certainly smaller ones and bigger ones. But that's just why it's one factor. And that's why the application note is clear that referencing 856, you know, that's the directive from Congress, that it should be generally like the 856 crime of maintaining a presence... If it was 100 pounds... If it were smaller packets of marijuana, let's say 10 times smaller than the actual loads that were being stored there, but the amount of time was 10 times longer, so you had the same volume at the end of the day, 10 times longer. Do you think we ought to have a different result in that case? Potentially, Your Honor, because the commission in formulating this enhancement from the directive from Congress focused on the frequency of the illegal conduct vis-à-vis the legal conduct at that location. And that's what the district court failed to adequately assess. The district court mentioned that, well, this was a family home and they raised kids there, but gave it essentially little weight, which was error because the application note says it should be great weight. In other words, it's one of the factors it spells out. And application notes are still controlling post-booker. They need to be addressed by the court. They can eventually, obviously, be disregarded as a matter of policy and a variance can be reached. How does this case come out if everything is the same except the room it's stored in is a room rented just for this? But in terms of frequency, you know, you're really focusing on frequency, but the facts are the same. As you say, 246 days and just 14 days of storage in this rented facility. How does the case come out then? Well, I think it's still one of factors that needs to be addressed. Who wins? Do you imply the Hansman to that case? An individual that uses that location more frequently for one purpose and one purpose only would have, obviously, a harder argument to say that it is less frequent. But would it be a drug house if all you did is you just rented this room, it's in some storage facility, you rented it, you're renting it the whole 246 days, but it's only 14 days where there's marijuana stored there? Then that individual rented it basically 100% of the time for that purpose, didn't use that storage facility for anything else. That individual would be subject to the enhancement. Even though the frequency was still 5%? Well, it's 5.6% of 246 days of life, but it's 100% of the use of that facility. In this instance, we don't have that. We have, obviously, 100% use of the home for the purpose of living, shelter. Does the evidence show how the room or rooms were used when there wasn't marijuana there? No, but when there's no marijuana, there's no illegal conduct being done. That's the whole point of the enhancement. It's to punish individuals that use a residence for a substantial purpose being distribution, selling, storing of controlled substances. If Congress and the Commission had wanted an enhancement to just penalize homeowners or leaseholders differently than street dealers, they could have done that. They could have said, if the marijuana is being stored, sold, or distributed from a home, that you are the owner or leaseholder of, have a possessory interest in somehow, then you get a two-level enhancement. They didn't do that. They focused on the substantial nature of the crime, but also the frequency of the illegal conduct, and that's different. What does the evidence tell us about, there were these four transactions and there's a certain number of days, about the fortuity of those numbers of days? I mean, does the evidence tell us anything about the record, in other words, about when the defendant was contacted? Is it just a fortuity that it was only four times? He was always available for this purpose any time they contacted him. Does the record tell us anything about that? I'm just focusing on maintaining a premises for the purpose of distributing a controlled substance. In other words, were there wiretaps or something that would show that he got that apartment or that home with that mindset? Or that he was willing to make a portion of his home available for this purpose at any time, and it's just a fortuity that they called him four times and moved the drugs within one to two days once and seven days another time? Anything at all? No, not that I'm aware of, Your Honor, but certainly the point of Mr. Johnson's involvement was he was the person. They would unload the tractor-trailer somewhere in Blytheville. The last instance was a parking lot, I think, at a restaurant, kind of in broad daylight, and then take it to the home in individual packages and keep it there briefly and then take it elsewhere. He was a good location to be an intermediary. He was right off of 55, and he was a good spot between the supplier and the ultimate distributor. Essentially, yes, Your Honor. But there's nothing in the record that would suggest that he wasn't available any time they wanted him. Or that he said no whenever they said, we have a shipment coming. No, there's not anything like that in the record. So essentially, Your Honor, frequency, frequently as used in the guideline application note, should mean what it means, plain language, right? And that is regularly, habitually, often. It shouldn't mean what I think the facts represent in this case, which is occasionally, rarely, seldom. That's the antonym of frequently. So if the guideline application note is to have any use anymore, or are we going to just ab initio disregard it, which I think is what Miller says, basically, because it would lead to absurd results. The Miller court just disregarded it. We basically are overruling all our pre- and post-Booker case law that says the application note is controlling and that the district courts must apply it properly, arrive at a sentencing range that's correct, and then engage in the 3553A analysis and determine whether any variance is appropriate. That wasn't done in this case, Your Honor, and we respectfully submit that based on the facts it doesn't rise to the level of substantial use and the enhancement should not be applied. Thank you. Kevin Ritz. May it please the Court, Kevin Ritz of the United States. The district court properly applied the enhancement in question. The defendant stored 300-pound quantities of marijuana four times at his residences. The evidence also showed that the drugs were repackaged and even weighed for redistribution at that residence. The amount, volume, and frequency of the shipments demonstrated that the drug-related activity was a primary or principal use, not just a collateral use, and the defendant cannot show clear error on this record. Would you agree that the frequency factor itself is rather weak in this case? I'm not sure I would agree with that, Your Honor. I mean, what is it? Four times over an eight-month period. You're talking about a week total or something like that, right? What we would say about the calculations that the appellant submitted to the court is we're not really sure the inferences support that. Tell us what the inferences support, then. It's pretty vague, Your Honor. It's pretty vague in terms of exactly how long these drugs were there on each occasion. He says 14 days. What's the better set of inferences, even if you get them read your way? You could infer, Your Honor, that the shipments came six weeks before these transactions. You could infer that the drugs that he was caught with on December 1st had been there for three months. There's really nothing in this record to demonstrate that they had just come a couple days before or a week before. We would submit that you can read that either way. So it's not really a stronger. It's your burden, isn't it, to show that requirements of this thing are met? Yes, Your Honor, no doubt. That doesn't help you. I mean, we're probably back to 14 days then, right? What we would submit does help us, Your Honor, is it's not just the volume, which is large, of these deliveries and not just the four times, but there's also the evidence that he distributed marijuana, his admission to supplement his income. This was part of what he was doing to make money. He made that admission. The evidence of what he was found with at the end of this investigation on December 1st, the firearm, scales, $15,000 in cash, and a substantial portion of that last and final delivery. Why do those things show it was a drug house? Your Honor, those are tools. It shows it was a drug operation. And he's carrying on his role in that operation at his house. And we would submit that's part of what this enhancement is here for. And I guess we would submit a couple. If we're talking about why are we applying this enhancement, I think we have enhancements for other people who play different roles in conspiracies, people who are the enforcer and commit felonies in furtherance of a conspiracy, certainly the organizer or leader. And this enhancement is there in part to penalize someone who is using the regional distributor, the regional warehouse for the large-scale operation. There's also, of course, the consideration that, and this is why the idea that it's also used for the family home cannot preclude application of the enhancement. In fact, in our view, that supports application. If you have certainly children, not just other innocent people, in this residence and you're exposing them not only to the risks of violence that are associated with drug trafficking, but just the very practical risk of there's a lot of marijuana in the room and there's a risk that those people could be using those controlled substances. It's also an offense against property. Section 856 makes that pretty clear that this is an offense. Your Honor, Section 856, this is really a question for both of you, but on the frequency point, what's a good case? Assuming those cases under 856 apply here to this enhancement, so same test and so forth, what's the best case that shows either don't worry about frequency with this kind of volume or this is enough frequency or there's something about the inferences? I would point to actually the cases on the enhancement. The Miller case, for example, we're talking about Mrs. Miller here. Mrs. Miller had five transactions, five incidences where she received money at this residence over a 12-month period. That was enough. In fact, it was pretty clear she played a lot less of a role. You said five instances of receiving money? Correct, at the residence in question in the Miller case over a 12-month period. Here we have four over a 6- to 8-month period depending on how you measure it. Her role in that conspiracy was a lot more limited than Mr. Johnson's role here as providing this place for them to be storing these large amounts. Miller was a family house? It was, Your Honor. It was at least, yes, the 17-year-old son and the couple lived there. Sanchez was also a case where it was a family home or at least family members lived there. That was similar in that case. It was pretty clear that the defendant didn't keep the drugs there long. It was a cocaine case, and there were large amounts of cocaine in the garage. But they came in and out, in and out, and it didn't matter. At the end of the day, the enhancement applied because of the scope and the volume of the drugs coming through the home. And that's, again, what we have here. These are 300-pound deliveries. The evidence suggested that they broke this up. The PSR does suggest that they broke this up into 60-pound kind of containers, these plastic containers, which are fairly heavy containers. And that's going to take up a pretty large portion of wherever room it's in. I will say that other than the final seizure of drugs on that final time, there's really nothing in the record to show where in the residence these drugs were kept. So I don't know that we can infer that it was in a bedroom. It was in a bedroom on that fourth time. But, you know, at the end of the day, it's a clear error standard. And the totality idea, we think, makes sense. I mean, this is a determination the district courts should be able to make. The reason these other cases are helpful is because they've kind of, first of all, disabused us of the notion that the fact that it's a family home precludes an application of the enhancement. Use of this residence is not necessarily a zero-sum game. In other words, if you use it 100 percent of the time for your residence, that doesn't mean there's only zero percent for other uses. There could be several primary uses of a premises, a residence or otherwise. We submit here certainly a primary use is as his family residence, but it's also a primary use to carry on this legal operation. And the other reason these cases are instructive just in terms of fleshing out the scope and frequency in tandem. And different facts come into play in different scenarios. Here, again, with the amount of drugs that we're talking about, the number of times over a six-month period, the paraphernalia. I have a question about the statute versus, I guess it's a comment, note 17. So the statute talks about premises and purpose, but the key word is premises. Then when you get to the setting, it's comment 17. It says maintains the premises and then it parens, i.e., a building room or enclosure. It's disjunctive. So does that mean you can take a family house and then your principal purpose inquiry or a primary purpose inquiry is about the one room in the house? Because that's the way it seems to read, which, you know, maybe it's either an aggressive reading of the statute or that's fine. But the point I'm making is what do you generalize off of? Do you generalize off of the primary purpose of the house or the primary purpose of a room within the house? Obviously, it's easier for you if you're focused on the room that was used for storage, particularly if, for example, it's just a room that's used for nothing else. So it's, like, arguably the exclusive purpose, even though you would never say that's the main purpose of the house. Do you see what I'm saying? I'm not possible, Your Honor. Are we talking about the word place in 856A1? No, we're talking about premises versus room. Oh, okay. In the statute or, no, the guideline, it refers to premises. Right. In this one comment, it says premises, i.e., a building room or enclosure. I see your point. To take this case, a bedroom, do you just focus on how often that room is used for storing marijuana or do you focus on the whole house? I think it can be either, Your Honor, and I think it would depend on the case. Doesn't that seem like a big difference? It seems like it really lightens your load to allow the government to focus on just how one room in the house is used and whether a primary purpose of that room is marijuana storage. You can imagine a situation where it's like, well, they didn't use it for anything else, but they sure were using the rest of the house for a lot of other things. Right, Your Honor. I'm not sure that at the end of the day it would make that much of a difference. I guess if you had a very, very large house with lots of rooms. I think at the end of the day the court can assess how big a house is, which room was being used, what part of the house or premises were being used. And, again, it's not just houses we're talking about. It's a storage facility. It could be a business. It could be all sorts of premises. But here, you know, there is no real indication as to how big these houses were. And, again, other than that final delivery, there's nothing really to show exactly where in the house it was being kept. It does seem as if these were not large places. The cars were being backed up, and then they take in plastic containers and then take them out and then take them back to the parking lot for redistribution. One thing I will say about 856, Your Honor, is this court has interpreted 856 a little more broadly than this enhancement suggests we should apply this enhancement. What I mean by that, in the Russell case, this court determined that the test for an 856 is whether the use is a significant use. That's a little bit lower bar than here, where the application note directs that it should be a primary or principal use. Do you think we shouldn't apply the 856 cases to this guideline? No, I think they're instructive, Your Honor. But I do want to make sure it's clear that there's a little bit different test, at least the way this court and most other courts have interpreted 856a1. It's a little bit broader in our view. But we think that helps us in the sense that this is an enhancement that's modeled at fair sentencing acts to model the enhancement. It helps you that the guideline is harder to reach than the statute? Yes. How does that help you? It helps us in that if we're looking for these similar types, if the instruction is to model an enhancement after the statute, and this court has said the statute should be interpreted broadly, then we are submitting that the enhancement should be interpreted broadly. I was just trying to call, I just wanted to specify there is a difference in the text of the commentary that's not present in the statute and the case law that this court has, how this court has interpreted that statute. But for all these reasons, again, the enhancement, the purpose of the enhancement, the text of the enhancements, which specifies that storage triggers the enhancement. So if there was any doubt, they amended the enhancement the year after they put it into effect and said storage is enough. And here, again, this could be a different case. If we only had one delivery, it could be different. If we had two, it could be different. If we had 30-pound quantities of marijuana as opposed to 300 pounds, it would be different if we didn't have all this drug paraphernalia or if the defendant had not admitted that this was part of what he was doing for his income, which these other courts that have talked about this enhancement have found persuasive. But we have all those facts here. For those reasons, we don't see any clear error on this record and ask this court to affirm it. All right. Thank you very much. Thank you, Your Honor. Mr. Perry, some rebuttal time? Your Honors, the reasonable inferences that can be made in this record are based on the PSR, paragraphs 9, 12, 19 through 21. I don't think we can go anywhere beyond that. And that, again, shows the frequency. They say when the delivery was made? Yes. This is based on information that was provided to the United States from cooperating co-conspirator at some point later in the case, but also just through surveillance. At some point, they just started watching the 400 Pittman residents and saw the delivery happen when it happened. Yeah, so I'll go back and look. But, I mean, so it makes it clear in the PSR that 300 pounds comes in and the same 300 pounds goes out? Over a course of two days in one instance or a course of approximately a week in one instance, yes. I think Your Honors can extrapolate based on that information the time period in which marijuana, based on this conspiracy, was stored at first the 400 Pittman address and later at the 225 Lakewood address. What's your best case? So on the frequency point, the question I asked Tim, what's the best case that shows that this is enough of a frequency problem that it dwarfs the other things, even volume? Well, we don't have a case post the amendment that rules in our favor. How about an 856 case? The 856 cases basically are affirming those convictions after a trial where it was argued it wasn't substantial use of the premises. And essentially the law is as long as it's done more than once, it triggers the crime. And so certainly that wasn't what the commission had in mind in fashioning this guideline application note because otherwise why would they stick infrequently?  But it wasn't obviously a strict continuation of 856. They added language that is different. And as the United States concedes, it's more onerous under the enhancement than it is to actually prosecute someone. I don't have 856 in front of me. What is the difference between... Isn't 856 and the guideline pretty similar or materially similar?  That's correct. But the application note guides the district court in determining what indicia of facts are important to determine that this use of the premises was substantial for that purpose. And that's higher, as the United States concedes, than just prosecuting an individual for maintaining. And I see I'm out of time. Thanks for your helpful argument. Thanks to both of you for your helpful briefs and arguments. The case will be submitted. The clerk may call the next case.